# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CAROLINE WETTERSTEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-08516 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| JOSEPH FOX, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Caroline Wettersten was an investor in the startup company Ditto Holdings, Inc. ("Ditto"). In November 2012, Wettersten made an investment with the company that contained a put option whereby Ditto, upon timely notice by Wettersten, was obligated to buy back up to 150,000 shares from Wettersten at $1.00 per share. In the event that Ditto failed to buy back the shares, its Chief Executive Officer ("CEO"), Defendant Joseph Fox, promised to buy back the shares himself. Despite twice attempting to exercise the put option, Wettersten has never received payment from either Ditto or Fox. As a result, Wettersten brought the present breach of contract action against Fox. The parties tried Wettersten's claim in a bench trial. Now, for the reasons that follow, the Court enters judgment for Wettersten.

## TRIAL EVIDENCE

This Court held a three-day bench trial on Wettersten's breach of contract claim. Fox represented himself *pro se* during the proceedings. During the trial, the Court heard testimony from Wettersten, her son Charles "Charlie" Wettersten ("Charlie"), and Fox. The testimony and evidence presented at trial is summarized as follows.

## I.    Factual Overview

Fox served as Ditto's CEO from its incorporation in January 2009 until it went out of business in December 2015. Ditto ran a website known as Ditto Trade. Ditto Trade allowed its users to "attach" themselves to another user and mirror stock purchases made by that user at the same price. Near the end of 2011, Wettersten's son, Charlie, began working for Ditto. Part of Charlie's job was to solicit investments in the company.

Sometime in 2012, Wettersten was solicited by Charlie to invest in Ditto. Initially, she purchased 208,333 shares of Series A Preferred Stock. Along with Wettersten, Charlie also solicited investments from his father, his grandfather, and his brother. Furthermore, Wettersten loaned Ditto $125,000. In November 2012, Wettersten made an additional investment in Ditto whereby she purchased 120,000 shares for $60,000. The terms of the investment were set out in a letter signed by Fox in his capacity as Ditto's CEO ("November Investment"). (Pl.'s Ex. 1.) That letter read as follows:

> Dear Caroline,
>
> This is to confirm your agreement with Ditto Holdings, Inc. (the Company) in connection with your purchase of 120,000 shares of Ditto Holdings common stock at a purchase price of $.50 per share.
>
> You will convert to shares of Ditto Holdings common stock the principal amount ($125,500) and accrued interest ($12,550) under the 10% convertible promissory note of the Company currently outstanding to you, resulting in an issuance to you of 330,001 shares of common stock.
>
> In addition, your 208,333 shares of Series A Preferred Stock will be converted to 250,000 shares of common stock.
>
> As a result of these transactions, your aggregate holdings in Ditto Holdings, Inc. will be 700,001 common shares—consisting of the 120,000 shares purchased currently, the 330,001 shares resulting from the note conversion, and 250,000 shares resulting from the conversion of the Preferred A stock.

> Finally, in consideration of your investment, the Company promises, upon receipt of written notice of your election to such effect, given within ninety (90) days of the first anniversary of this letter, to buy back from you up to 150,000 common shares (as your notice of election indicates) at a purchase price of $1.00 per share. If for any reason the Company fails to repurchase your shares for $1.00 per share after having received a timely request to do so, then I will personally repurchase your shares for the $1.00 per share price (up to 150,000 shares).

(*Id.*) In short, as part of her investment, Wettersten also agreed to convert the promissory note underlying her loan to the company into 330,001 shares of common stock, and her existing investment of 208,333 shares of Series A Preferred Stock was converted into 250,000 shares of common stock. Furthermore, the November Investment included a put option under which Ditto was obligated to repurchase up to 150,000 shares of common stock for $1.00 per share upon Wettersten's request if given within 90 days of the first anniversary of the agreement, November 6, 2013. Fox further bound himself to repurchase the shares at the same price per share if Ditto failed to honor that obligation. Wettersten executed the agreement by signing the letter.

On January 22, 2014, Wettersten gave Ditto notice of her intent to exercise the put option and requested that Ditto buy back 150,000 shares of her common stock for $150,000. Instead of buying back the stock as requested, Ditto negotiated an extension of the put option. In a letter dated February 4, 2014 sent to Wettersten, Ditto confirmed that Wettersten and the company had entered into an extension agreement whereby the put option would be exercisable on June 1, 2014, provided that Wettersten gave the company notice of her intent to do so between May 15 and May 31, 2014 ("February Letter"). (Pl.'s Ex. 2.) The February Letter also stated that "[a]ll other terms of your investment with the Company remain intact and in full force and effect." (*Id.*) Fox signed the letter, and upon receipt Wettersten did too.

Wettersten again attempted to exercise the put option by sending Fox a letter dated May 15, 2014. (Pl.'s Ex. 3.) In the letter, Wettersten requested that Ditto purchase 150,000 shares for

$150,000. She requested that the matter be "handled in an expediant [*sic*] manner" and indicated that she hoped to receive payment by June 6, 2014. (*Id.*) Yet, Wettersten did not receive her requested payment by that date, or at any time thereafter.

## II. Wettersten's Case

### A. Wettersten's Testimony

Wettersten began her case by testifying on her own behalf. With respect to the November Investment, Wettersten testified that she wrote no part of the agreement. In addition, she stated that the put option was essential to her decision to make the investment, as it gave her the assurance that she could recover at least a portion of her money if the investment did not pan out. After her first attempt at exercising the put option, Wettersten stated that she might have had one conversation with Ditto, but there was no real negotiation because she was agreeable to the extension. She stated that neither Fox nor Ditto suggested that her notice was too late or that the put option was no longer valid. Instead, Fox simply stated that Ditto needed a little more time and stated that Wettersten would receive an extension letter. Again, Wettersten stated that she had no role in drafting the February Letter. Wettersten reported that Fox never claimed that the February Letter absolved him of his obligation to repurchase the 150,000 shares if Ditto failed to do so. When Wettersten sought to exercise the put option a second time by sending the May 15 letter, she testified that she did not receive a check by her requested deadline of June 6, 2014. Nor did she receive any communication in response to her letter. At no point did she receive $150,000 for the 150,000 shares from either Ditto or Fox.

In late June 2014, Wettersten attempted several times to call Fox and left him voicemails inquiring as to the status of her payment for the 150,000 shares. While Wettersten had previously spoken directly with Fox on multiple occasions, she testified that after exercising the put option

she had no direct interaction with Fox until almost a year later in July 2015. During that conversation, Wettersten asked Fox why she had not been paid pursuant to the put option. Fox replied that she had given up her put option in exchange for more shares in Ditto. Wettersten claimed that she was unaware of such an agreement. Instead, she testified that she sought to exercise the put option and sell back shares to Ditto because she had invested far too much and wanted to take money out of the company.

On cross-examination, Fox began by asking Wettersten if she had received emails from Fox in his capacity as CEO of Ditto, to which she responded in the affirmative. Further, Wettersten stated that she responded to some of those emails and agreed that she had Fox's correct e-mail address. Fox then asked Wettersten about an email Charlie sent to Fox in which Charlie lists Wettersten's various investments in the company. (Def.'s Ex. 34.) He asked if it was fair to say that Charlie was negotiating on Wettersten's behalf regarding her investments with Ditto, and Wettersten agreed that he was. Furthermore, Wettersten stated that she believed Charlie would communicate with Fox regarding her stock certificates. Fox then showed Wettersten an email Charlie sent to her in which he asked Wettersten to sign the November Investment, which he would then give to Ditto. (Dkt. No. 36.) Wettersten stated that she believed that Charlie did in fact bring the signed document to Fox.

Fox introduced into evidence a letter dated January 4, 2013 containing the terms of an investment that Wettersten's ex-husband and Charlie's father, Reid Wettersten ("Reid"), made with Ditto. (Def.'s Ex. 21.) Like Wettersten's November Investment, Reid's investment contained a put option under which Ditto promised "upon receipt of written notice of your election to such effect, given within thirty (30) days of the first anniversary of this letter, to buy back from you up to 150,000 common shares (as your notice of election indicates) at a purchase price of $1.00 per

share." (*Id.*) Unlike Wettersten's put option, Reid's option provided a shorter notice period and it did not come with Fox's agreement to purchase the shares in the event that Ditto failed to do so. Fox then introduced a letter that Reid sent to him in which Reid discusses the put option and apparently recognized that he needed to send Fox notice by December 4, 2013 if he decided to exercise his option. (Def.'s Ex. 28.) Wettersten acknowledged that the December 4, 2013 date was 30 days before the first anniversary of the letter granting Reid the put option. Thus, Wettersten agreed that it appeared to be Reid's understanding that to give notice "within" 30 days meant 30 days before the first anniversary of the letter.

Fox questioned Wettersten about a September 30, 2014 email that Charlie sent to Fox. (Def.'s Ex. 29.) In the email, Charlie sets out a two-step plan for his mother's investment. Step one involved her investing $100,000 of the put option for 233,334 shares of Series C Supervoting Preferred Stock ("Series C Stock"), decreasing her put option to 50,000 shares at $1.00 per share. Then, in step two, she would turn the 50,000-share put option into 120,000 shares of Series C Stock. He explained that "At this point She's ALL IN. God be with us." (*Id.*) Wettersten denied ever agreeing to exchange $100,000 of her put option for 233,334 shares of Series C Stock. Nor did she agree to a new put option whereby Ditto would be obligated to buy back only 50,000 shares for $1.00 a share.

Next, Fox asked Wettersten about a document entitled "Ditto Holdings, Inc. Rights Certificate" ("Rights Certificate"). (Pl.'s Ex. 5.) That document purported to set out the terms of Wettersten's purchase of Series C Stock. Most of the Rights Certificate is typed, but there are several blanks filled in with handwriting. On the last page, there is a signature line bearing Wettersten's name and dated "10-1." The signature is mainly printed, although the "e" and the "n" of Wettersten's last name are in cursive, and there is a flourish between the "C" and the "a" of her

first name that resembles an "l." Wettersten denied that the signature was hers. By contrast, she identified the cursive signature appearing on the February Letter as her own. Again, Wettersten denied ever agreeing to purchase Series C Stock. Moreover, she testified that she never authorized Charlie to negotiate a settlement of the 150,000-share put option on her behalf, nor did she ever tell him that she wanted to reinvest that put option back into Ditto. Finally, Wettersten claimed that she never received a company prospectus about the Series C Stock.

Wettersten was also questioned about an email between Charlie and his grandfather (and Wettersten's father), Edward Foulke. (Def.'s Ex. 31.) In the email, Charlie attaches documents related to the Series C Stock offering, and tells Foulke that he will fill out a rights certificate for 43,334 shares of Series C Stock. Fox inquired as to how Wettersten could have been unaware of the Series C Stock offering when her father had been fully apprised by Charlie. In response, Wettersten stated that Charlie may have spoken to her about it, but she testified that she did not understand it and did not have any awareness of what was being done. When Fox pointed out how that response contradicted her earlier testimony, Wettersten clarified that she only learned about the Series C Stock offering a year later; she did not know about it at the time that a portion of her put option was supposedly reinvested back into the company. Fox then showed Wettersten an email Charlie sent to her dated March 5, 2015. (Def.'s Ex. 22.) In the email, Charlie provides Wettersten with information concerning a second round offering of Series C Stock. Fox asked Wettersten whether she was aware of the Series C Stock at this point. Wettersten responded that she was aware of it, but still did not understand it. Another email was introduced concerning the Series C Stock, this one sent by Charlie to Reid on September 25, 2014. (Def.'s Ex. 27.) That email contained a rather substantial explanation of Reid's rights concerning the first round offering of Series C Stock.

In an October 29, 2014 email from Fox to Wettersten that Fox introduced, Fox informs Wettersten of Ditto's reverse stock split. (Def.'s Ex. 32.) There are several references to Series C Stock throughout the email. Wettersten acknowledged receiving the email. The same day another email was also sent to Wettersten regarding the reverse stock split. (Def.'s Ex. 33.) That email explained that it was providing numbers based on Wettersten's purchase in the first round offering of Series C Stock. Before the split, Wettersten held 233,100 shares of Series C Stock whereas after the split she held 23,310 shares of such stock. When asked whether those emails contradicted her previous testimony that she had not received any communication or information regarding the Series C Stock, Wettersten responded that prior to the offering she knew nothing about it and when she received those emails she was simply confused by the references to Series C Stock. She further stated that she never approved of the Series C Stock purchase referred to in the email.

Next, Fox questioned Wettersten about two emails dated February 20, 2015. (Def.'s Exs. 45, 46.) The content of the emails is the same, as Charlie is emailing Fox regarding Foulke's purchase of Series C Stock. However, in the second email, there are two attachments titled "Ed Foulke Ditto Series-C.pdf" and "Caroline Wettersten Ditto Series-C.pdf." (Def.'s Ex. 46.) And the attachment "Caroline Wettersten Ditto Series-C.pdf" was the previously introduced Rights Certificate. Once again, Wettersten denied that the signature on the document was hers and noted that it was in block letters instead of cursive. Fox referred to Wettersten's previous deposition testimony in which she stated that she never signed any agreement in block letters. He then introduced two exhibits, both of which were Wettersten's earlier agreements to purchase Ditto stock. (Def.'s Exs. 43, 44.) Fox directed Wettersten to the signature pages for each agreement. Each page contained a block signature for "Caroline F. Wettersten." He asked her if the block signature was hers. Wettersten responded that it was her name in block letters and she agreed that

she wrote it. Although Wettersten stated that it was her authentic signature on those agreements, she maintained that it was not her signature on the Rights Certificate.

Turning back to the email in which Charlie outlined a two-step plan for his mother's put option, Fox asked Wettersten whether she ever agreed to participate in the second round offering of Series C Stock by forgoing the remaining 50,000-share put option in exchange for 120,000 shares of Series C Stock. Wettersten denied making such an agreement. Fox then introduced an email between himself and Charlie dated October 1, 2014. (Def.'s Ex. 30.) The subject line read "Mom and Grandpa Series-C" and the attachment line again indicated that the Rights Certificate was attached to the email. Fox also introduced a Ditto stock ledger that had a line showing that Wettersten owned 23,310 shares of Series C Stock that were issued on October 24, 2014. (Def.'s Ex. 42.) He asked Wettersten whether she had received the Series C Stock certificate on or around October 24, 2014. Wettersten stated that she did not think so, as she did not possess a certificate and therefore assumed that she did not receive it. For her previous Ditto investments, Wettersten claimed to have received stock certificates.

Fox then introduced an email and one of its attachments that he sent to two individuals at the Securities and Exchange Commission ("SEC") concerning a subpoena issued by the SEC, which pertained to the first round offering of Series C Stock rights. (Def.'s Exs. 51, 52.) The attachment contained a list of all participants in the rights offering and was dated October 24, 2014. Included on that list was Wettersten, who is listed as owning 23,310 shares of Series C Stock amounting to an investment of $58,275. However, Wettersten pointed out that the list contained faulty information. Specifically, with respect to Foulke, the list states that he had invested $60,000 for 13,000 shares of common stock. Wettersten claimed that Foulke had been paid back for this investment by October 24, 2014. She knew this because Foulke had told her that

Fox had sent him a check. Nonetheless, she did recognize that Fouke made an additional investment thereafter, which accorded with another entry on the list. Moreover, Wettersten admitted that she was not completely certain that the information was faulty, but her testimony was based on what she could recall Foulke telling her.

Finally, Fox returned to the topic of Wettersten's signature on the Rights Certificate. Fox asked her if Charlie would have committed fraud if he had signed her name on her behalf. Wettersten claimed that she did not know that Charlie had submitted the Rights Certificate at all. Nor did she authorize him to sign it. Fox then pointed out that Wettersten had received an email around the same time setting out her purchase of the Series C Stock and asked why Wettersten did not inquire further about the stock or alert Ditto that she had made no such purchase. Wettersten again insisted that she was simply confused at the time. If she had more confidence, she might have contacted Fox or Ditto's counsel to clear things up.

On re-direct examination, Wettersten answered follow-up questions concerning several of the documents introduced into evidence by Fox. When asked about the lengthy email that Charlie sent to Reid on September 25, 2014, explaining the Series C Stock offering (Def.'s Ex. 27), Wettersten stated that she had not received a similar email from Charlie explaining the offering. Then, Fox asked Wettersten to look at the email he sent informing Wettersten that she held 233,100 shares of Series C Stock before Ditto's reverse stock split (Def.'s Ex. 33), and compare it with the Rights Certificate (Pl.'s Ex. 5). One of the pages of the Rights Certificate had a box checked next to the statement "I am purchasing 233,334 shares of Series C [Stock]." Wettersten agreed that the total Series C Stock shares purchased according to the Rights Certificate was different from the number of such shares that Fox later told her she owned. Further, despite the fact that Fox's email stated that Wettersten would receive a new stock certificate for the Series C

Stock shares in 30 to 45 days, Wettersten testified that she never received the promised certificate. As to Wettersten's block signatures that appeared on her earlier agreements to purchase Ditto shares (Def.'s Exs. 43, 44), Wettersten compared those authentic signatures to the signature on the Rights Certificate and stated that they did not look alike.

### B.     Charlie's Testimony

As her next witness, Wettersten called her son, Charlie. Charlie testified that he had filled in the blank spaces on the Rights Certificate. Fox asked whether the Rights Certificate and his September 30, 2014 email to Fox outlining a two-step plan for her put option (Def.'s Ex. 29), were connected. Charlie testified that they were, explaining that the Ditto was going through a reorganization that rendered its common stock nearly worthless. The new Series C Stock was set to make up 90% of the company's equity. At the same time, Ditto was planning on entering into a strategic partnership that Charlie believed would substantially increase the company's value. Thus, Charlie was attempting to get a deal done to protect Wettersten's stake in Ditto. The two-step plan was the deal he proposed to Fox. However, Charlie testified that Fox never responded to his September 30 email. Moreover, he stated that Wettersten never learned of the proposal.

When asked why he filled out the blanks in the Rights Certificate in his mother's name, Charlie explained that he did so as a placeholder for what he was sketching out in his head. He denied telling Wettersten that he had put her name on the Rights Certificate. Below the line with Wettersten's alleged signature, there was a blank signature line for a Ditto representative. Charlie could not recall whether anybody from Ditto ever signed the Rights Certificate. To his knowledge, only Ditto's CEO, Fox, had the authority to sign such documents.

Returning to his two-step plan for Wettersten's put option, Charlie explained that after step one, Wettersten would still retain a 50,000-share put for $1.00 a share. In other words, that

reduced put option would have remained an ongoing liability for Ditto. However, he never got a response to the September 30 email or subsequent texts to Fox regarding the proposal, Charlie testified that the deal was never committed to a formal writing. By filling in Wettersten's name on the Rights Certificate signature line, Charlie said his intent was to commit his mother to the deal. Nonetheless, Charlie understood that at the time and all times thereafter, he had no power to bind his mother to any investment without her permission. Instead, he intended to speak with her after hearing back from Fox. Because he never received a response from Fox, Charlie never broached the topic with Wettersten. Charlie claimed that he was unaware that Ditto had apparently treated the Rights Certificate as a fully executed agreement and accordingly issued the Series C Stock shares to Wettersten.

Screenshots of a series of text messages exchanged between Charlie and Fox were next introduced into evidence. (Pl.'s Ex. 9.) Charlie was asked about a message he sent to Fox on April 12, 2015, in which Charlie told Fox that he would like to discuss his parents' and brother's Series C Stock. Charlie explained that he wanted Fox to tell him that the deal outlined in the September 30, 2014 email looked good and that Ditto would move forward on it. However, Charlie did not receive a response that day. The following day Charlie sent Fox a similar message, again receiving no reply. Charlie testified that at the time he was feeling stressed, given that the common stock was now worth 10% of the company and 90% of the company was Series C Stock. He wanted to make sure he was advocating for the people he had recruited to invest in Ditto, including Wettersten. Over a month later, Charlie sent another text about his family's Series C Stock rights. He still did not get a response from Fox.

Fox began his cross-examination of Charlie by asking whether Charlie had any meetings with him between the end of 2014 through 2015. Charlie was able to recall one meeting around

May, when Fox told Charlie that he should take a 90-day break from the company. Fox then directed Charlie back to the text message chain previously introduced into evidence. On April 14, 2015, Charlie asked Fox if they could set up a time to discuss Reid and his wife's Series C Stock ownership. Fox asked Charlie whether Reid, at that time, had already purchased the Series C Stock shares. Charlie responded that there was no agreement at that time. Yet, Fox pointed to the list of Ditto shareholders he had attached to his email to the SEC. (Def.'s Ex. 52.) Included on that list was Reid, who it said owned 14,486 shares of Series C Stock at a price of $36,214. Still, Charlie said that Reid had not participated in the first round offering to his knowledge. By contrast, Charlie did agree that his grandfather, Foulke, had participated in the first round offering. In fact, Charlie was able to recall a conversation in which he convinced Foulke to invest in Series C Stock. Fox then asked Charlie whether he had a similar conversation with his father, Reid. Charlie stated that he likely had multiple conversations about the Series C Stock with Reid, but the only one he specifically remembered was in April 2015 when he was visiting Reid in Florida. He could recall that particular instance because it coincided with his attempts to text Fox and set up a discussion concerning his family's equity.

Fox next introduced a series of exhibits that he suggested showed that Charlie acted on Wettersten's behalf concerning her Ditto investments. (Def.'s Exs. 34–36.) Charlie confirmed that he negotiated all the significant terms of the investments his mother made with the company. In doing so, he believed that he was always acting in her best interests. Yet, Charlie disagreed that he handled all transactions related to Wettersten's Ditto investments. Specifically, he said that he was not involved in Wettersten's attempt to exercise her put option. Fox then asked Charlie about the September 30, 2014 email in which Charlie proposes a two-step plan for Wettersten's put option. Charlie agreed that the email shows that he was negotiating a deal for his mother under which she

could maintain her equity. His proposed deal involved, at step one, Wettersten converting $100,000 of her put option into Series C Stock shares. Further, Charlie confirmed that there would be a second round offering if, after the first round offering, not enough shareholders bought the Series C Stock. As part of that second round, Wettersten would be able to use the remainder of her put option to buy 120,000 additional Series C Stock shares.

One of the previously introduced exhibits was Reid's agreement to purchase Ditto shares. (Def.'s Ex. 21.) That agreement contained similar put option language but required Reid to exercise it within 30 days of the agreement's anniversary as opposed to the 90 days provided to Wettersten. Fox asked Charlie to look at an email Reid sent to Fox in which Reid expresses his understanding that he would need to exercise his put option on December 4, 2013. (Def.'s Ex. 28.) Charlie acknowledged that December 4, 2013 was 30 days before the one-year anniversary of the original agreement but disclaimed any knowledge as to what his father meant when he said he had to exercise the put option by December 4. Charlie's own belief was that "within 30 days" meant that Reid had 30 days on both the front and back-end of the anniversary. Later, Charlie clarified that he did not really think about the issue at the time.

Fox asked Charlie about conversations he had with Wettersten about the Series C Stock. Charlie claimed not to remember exactly how many conversations he had with his mother about the shares, but he did recall having many conversations with Wettersten about the put option—at least 10 to 20 conversations over a two-year period. Near the end of cross-examination, Fox asked Charlie if his family had invested a lot of money in Ditto. Charlie confirmed that they had. Given the amount of money his family had invested, Fox wondered why Charlie had not been providing sufficient detail to them regarding their investments. Charlie responded that he was more focused on growing the company than cashing out of it.

During re-direct, Charlie was asked about an email he sent to his mother attaching the November Investment. In the email, Charlie instructed Wettersten to sign the attached document. Charlie agreed he asked for his mother's signature because he did not have the power to enter into the agreement for her. Charlie's email attaching the November Investment was dated December 13, 2012. As far as Charlie could recall, Wettersten first received the November Investment document on December 13, 2012. And he stated that Wettersten had not signed the document prior to that date.

On re-cross, Fox had Charlie compare a November 6, 2012 email Charlie sent to Fox regarding his mother's shares (Def.'s Ex. 34), with the November Investment. In the email, Charlie noted that after his mother's shares were converted to common stock, she would own 526,100 shares. Charlie calculated that Wettersten would have to contribute $36,950 in additional capital to get to 600,000 common shares. Then Charlie suggested that they call it $35,000. However, in the November Investment, Wettersten ultimately purchased 120,000 shares for $60,000, bringing her total common stock shares to 700,001. Charlie confirmed that he had continued negotiating after the November 6 email so that Wettersten would get an additional 100,000 shares from what was originally proposed and for a lesser price. This, Charlie agreed, was a better deal than what was set out in the email.

### III.     Fox's Case

#### A.     Wettersten's Testimony

Following Charlie's testimony, Wettersten rested her case and Fox began his case. At the outset, Fox called Wettersten back to testify.[1] To begin, Fox asked Wettersten about her

---

[1] Fox indicated that he was calling Wettersten, in part, to question her about deposition testimony that he believed contradicted her trial testimony. The Court advised Fox that he should have impeached her during his cross-examination. Nonetheless, since Fox was proceeding *pro se* and had misunderstood the appropriate procedure for impeachment, the Court allowed him to proceed.

deposition testimony where she stated that she believed that she received an email in Fall of 2014 from Charlie regarding converting her put option into Series C Stock shares. When Fox asked whether that contradicted her trial testimony, Wettersten stated that she may have received it, but she did not read it thoroughly, she did not understand it, and she never followed up with Charlie about the email. Next, Fox asked if Wettersten made any Ditto-related transactions where Charlie was not involved. Wettersten said that Charlie was involved in most of them, but he was not involved in her January 2014 decision to exercise the put option. Yet, when Fox asked the same question during her deposition, Wettersten said she was not aware of any transactions in which Charlie was not involved.

### B. Fox's Testimony

Fox called himself as a witness. Because he was proceeding *pro se*, Fox opted to present his direct testimony in a narrative format. He began by detailing his history in the Financial Technology industry. In particular, Fox emphasized his "spotless" record with the SEC, the Financial Industry Regulatory Authority, and state regulators. Moreover, he claimed that he always put the interests of his business's shareholders, customers, employees, and regulators ahead of his own.

Eventually, Fox introduced as an exhibit a screenshot showing all emails that Wettersten had sent to his Ditto email account from June 1, 2012 through July 8, 2015. (Def.'s Ex. 40.) He noted that the screenshot shows that Wettersten sent him no emails between February 4, 2014 through July 7, 2015. Thus, he asserted that Wettersten did not attempt to contact Fox by email in response to the October 29, 2014 email informing her she held Series C Stock. Fox also stated that he personally mailed out Wettersten's Series C Stock certificates to the same address he mailed her previous stock certificates.

As to the put option language, Fox testified that he always understood the "within 90 days" language to mean 90 days before the first anniversary. Based on his interpretation of that language, Wettersten missed the exercise date by sending notice that she would exercise the put option on January 22, 2014. Nonetheless, Fox offered her an extension on the option as a courtesy because she was a large shareholder. Fox insisted, however, that his personal guaranty that he would buy the shares if Ditto did not was not part of the extension agreement. Moreover, he claimed that he had many significant conversations with Charlie about Wettersten's put option and the possibility of converting it to Series C Stock shares.

Fox stated that the first round offering of the Series C Stock shares began on September 16, 2014 and ended in early-to-mid-October. On October 1, 2014, in the middle of the first round offering, Fox testified that Charlie sent him the Rights Certificate. The Rights Certificate embodied Fox's negotiations with Charlie concerning Wettersten's put option. Shortly before then, Fox had also sent Wettersten a link to a webinar that explained the offering and why it was important to participate. Fox ended his direct examination by emphasizing that, despite Wettersten's testimony that she never signed agreements with a block signature, he had two exhibits showing the contrary. (*See* Def.'s Exs. 43, 44.)

On cross-examination, Wettersten directed Fox back to the screenshot he took of his email inbox showing emails he received from Wettersten. (Def.'s Ex. 40.) One email dated January 22, 2014 appeared to be a copy of Wettersten's notice exercising the put option, which Fox did not dispute. Wettersten further observed, and Fox agreed, that Wettersten sent six emails around the late-January 2014 timeframe. The last email, sent on February 4, 2014, began with Wettersten saying "Joe, I'll look forward to receiving the agreement." Fox said that he responded to each of those emails, yet he could not identify an email where he informed Wettersten that although she

was late in exercising the put option, Ditto would nonetheless grant her an extension as a courtesy. He explained that there was no such email because he was not going to offer an extension until Charlie convinced him otherwise. Nor did Fox send Wettersten an email explaining that the extension was being given as a courtesy because that issue was discussed by telephone. That telephone conversation occurred sometime between January 30, 2014 and February 4, 2014. Fox testified that during that conversation, he informed Wettersten that her January 22 notice was 77 days late. Nonetheless, Fox remained fully committed to extending her put option and that is what happened.

Wettersten asked Fox about two different stock ledgers that had been submitted as exhibits. Fox explained that one was a stock ledger that listed the stock certificate number and the number of shares issued. (Def.'s Ex. 42.) The other was a more detailed list that provided the dollar amount invested and the date the stock certificate was issued. (Def.'s Ex. 52.) Yet, for Wettersten's Series C Stock, the ledger showed the issue date as October 24, 2013 whereas the more detailed list showed an issue date of October 8, 2014. Fox explained that the ledger tracked the day the stock certificate was issued and the detailed list tracked the day the person made the investment.

Earlier in the trial, the Court asked Fox for his home address, which Fox was reluctant to provide because of death threats. Wettersten asked about the death threats. Fox explained that in January or February 2016, he had received threats from a former shareholder who he claimed had communicated with Wettersten. Fox also explained that he is not currently employed, and he last earned wages in 2014. Since the company ceased operations on December 18, 2015, Fox has not earned any income. After Ditto shut down, however, Fox stated that the company tried for several months to find a buyer for its technology or a strategic partner.

Wettersten then returned to the topic of the November Investment. She asked Fox who wrote the letter agreement. Fox testified that Ditto's general counsel drafted the letter, and Fox approved and signed it. Similarly, Ditto's general counsel also drafted the February Letter. Fox asked the general counsel to prepare it, and then Fox reviewed, approved, and signed the letter. Indeed, it was Fox's custom and practice to review and approve such documents. Wettersten asked Fox how many other investors were given put options similar to Wettersten's. Fox could recall only four. And only one investor successfully exercised the put option.

Previously, Fox gave deposition testimony stating that he did not recall specific conversations with Wettersten where he offered to extend the put option but stated that he would no longer personally guarantee payment. In addition, Fox stated that while he had phone calls with Wettersten around the time she first attempted to exercise her put option, he could not remember specifics of any conversation.

Wettersten then asked Fox about her May 15, 2014 letter, wherein Wettersten again attempted to exercise her put option. She asked Fox why Ditto did not pay Wettersten the $150,000. Fox claimed that Ditto did not have an obligation to buy back the shares in June 2014.[2] Then, in October 2014, Wettersten agreed to exchange $100,000 of her put option for the Series C

---

[2] Fox testified that Wettersten had entered into another extension agreement in May 2014. Although Fox testified that he possessed a copy of the agreement, Wettersten had never seen such agreement and claimed that no such agreement had been produced in discovery. Despite not having a copy of the agreement readily available, Fox believed it had been submitted to Wettersten during discovery. This Court gave Fox the chance to demonstrate that the extension agreement was produced in discovery, specifically by producing a Bates numbered version of the document. Following trial, Fox issued a notice of offer of proof of the existence of a new extension agreement (Dkt. No. 73), but conceded he did not have a Bates numbered version of the document. Because Fox could not prove that he produced a third extension agreement in discovery, Fox could not introduce the document and testimony regarding it for the first time in trial. *See* Fed. R. Civ. P. 37(c). Accordingly, any testimony regarding that extension agreement is stricken and the Court declines to consider the document Fox produced following the trial.

Stock shares. Fox did concede that Ditto still owed Wettersten the remaining $50,000 at the time Ditto went out of business.

Next, Wettersten turned to the issue of Ditto's finances. Fox testified that Ditto had plenty of money to buy back Wettersten's shares in 2013. In fact, Ditto bought back shares from Fox's mother and two brothers that year. As to Wettersten's put option, Fox could not recall how the $150,000 put option was recorded on Ditto's balance sheet. While the company maintained a general ledger, Fox could not explain how the $150,000 was treated for accounting purposes.

Fox admitted that the SEC was investigating both he and Ditto during the Fourth Quarter of 2014. In addition, Ditto was a party to a lawsuit involving a former Ditto executive. Financially, Ditto was in dire straits and desperately needed cash.

## DISCUSSION

The Court has considered the evidence presented, including the testimony of the above witnesses and the exhibits submitted by the parties. Based upon that evidence, the Court enters the following conclusions of law and findings of fact pursuant to Federal Rule of Civil Procedure 52.

As an initial matter, this Court finds that it has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and the parties are citizens of different states. Specifically, Wettersten is a citizen of Illinois and Fox is a citizen of California. Wettersten has asserted a claim for breach of contract, seeking to recover $150,000 she claims is owed to her pursuant to the November Investment's put-option provision. Both parties agree that Illinois law governs. Under Illinois law, the elements of a breach of contract claim are: "(1) the existence of a valid and enforceable contract; (2) the performance of the contract by plaintiff; (3) the breach of the contract by defendant; and (4) a resulting injury to plaintiff." *Hickox v. Bell*, 552 N.E.2d 1133, 1143 (Ill. App. Ct. 1990).

Fox raises three arguments in his defense.[3] First, he contends that Wettersten provided notice of her exercise of the put option too late, and therefore she failed to meet the performance of the contract element. This argument goes to an element of the breach of contract claim for which Wettersten bears the burden of proof. *See Mannion v. Stallings & Co.*, 561 N.E.2d 1134, 1138 (Ill. App. Ct. 1990). Further, Fox argues that the extension granted in the February Letter extinguished his personal guaranty to buy back the shares in the event that Ditto failed to do so, thus there was no longer a valid and enforceable guaranty agreement. Finally, Fox claims that Wettersten's damages are limited to $50,000 because after she attempted to exercise the put option, she entered into a new contract whereby she agreed to invest $100,000 of her put option in shares of Ditto's Series C Stock. Because his second and third arguments are properly considered affirmative defenses, Fox bears the burden of proof. *See, e.g.*, *JPMorgan Chase Bank, N.A. v. East-West Logistics, LLC*, 9 N.E.3d 104, 116 (Ill. App. Ct. 2014) (noting that extinguishment of guaranty agreement is an affirmative defense); *Wired Music, Inc. v. Clark*, 168 N.E.2d 736, 738 (Ill. App. Ct. 1960) ("The burden of proving that the damages were not correct or unfair was on the defendant that breached the contract." (internal quotation marks omitted)).

---

[3] In his answer to Wettersten's complaint, Fox characterizes each of his defenses as falling under the affirmative defense of estoppel. However, Fox's defenses do not fit into any estoppel doctrine recognized by Illinois courts. *See, e.g.*, *Matthews v. Chi. Transit Auth.*, 51 N.E.3d 753, 779 (Ill. 2016) ("Promissory estoppel is a common-law doctrine adopted to permit the enforcement of promises that are unsupported by consideration . . . ."); *Shoup v. Gore*, 14 N.E.3d 11, 13 (Ill. App. Ct. 2014) ("The doctrine of judicial estoppel bars a party from making a representation in a case after he has successfully taken a contrary position in another case."); *Hubble v. O'Connor*, 684 N.E.2d 816, 823 (Ill. App. Ct. 1997) ("Equitable estoppel is a doctrine that is invoked to prevent fraud and injustice. It arises whenever a party, by his word or conduct, reasonably induces another to rely on his representations, leading that person to change his position so as to be injured."). Because pleadings and arguments by *pro se* litigants are generally construed more liberally than those presented by counsel, *see Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016), the Court deems it appropriate to properly characterize Fox's defenses and evaluate them accordingly.

## I.    Timely Exercise of Put Option

The Court finds, and Fox does not deny, that the November Investment and the put option therein constituted a valid and enforceable contract. Nonetheless, Fox asserts that Wettersten failed to perform under the contract because she did not timely exercise the put option. According to Fox, the language that notice must be provided "within" 90 days of the first anniversary meant that notice had to be provided within the 90-day period *prior to* the first anniversary. And because Wettersten provided notice 77 days *after* the first anniversary of the November Investment, her notice was untimely. Thus, according to Fox, Wettersten failed to meet the condition precedent to Ditto's performance and Fox's guaranty obligation. Wettersten, on the other hand, argues that her notice was timely because it was provided 77 days after the November Investment's first anniversary, which also constitutes "within" 90 days of its first anniversary.

The Court concludes that the term "within," as used in the November Investment is ambiguous. "A contract term is ambiguous if it can be reasonably be interpreted in more than one way due to the indefiniteness of the language or due to it having a double or multiple meaning." *William Blair & Co., LLC v. FI Liquidation Corp.*, 830 N.E.2d 760, 769 (Ill. App. Ct. 2005). The Merriam-Webster Dictionary defines "within" "as a function word [used] to indicate enclosure or containment" or "as a function word [used] to indicate situation or circumstance in the limits or compass of." *Within*, Merriam-Webster, www.merriam-webster.com/dictionary/within (last visited Sept. 30, 2019). Merriam-Webster further explains that "within" can mean "before the end of," which supports Fox's interpretation, but it also can be "used as a function word to indicate a specified difference or margin," which supports Wettersten's interpretation. *Id.*

Generally, an ambiguity in a contract is construed against the drafter. *Zwayer v. Ford Motor Credit Co.*, 665 N.E.2d 843, 846 (Ill. App. Ct. 1996). Yet here, Fox argues that as a

guarantor, he is entitled to the benefit of the doubt. It is true that "when doubts arise from the contract language a guarantor will receive the benefit of that doubt and the contract will be construed in his favor." *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Schulson*, 714 N.E.2d 20, 24 (Ill. App. Ct. 1999). And the Court concludes that Fox is a guarantor with respect to the put option. A guarantor is one who "promise[s] to make payment on or fulfill an obligation if the person primarily liable fails to perform." *Panno v. Nicolau*, 529 N.E.2d 95, 98 (Ill. App. Ct. 1988). That is precisely what Fox promised to do. In the event Ditto failed to buy back the shares as Wettersten requested, Fox personally promised to do so on the same terms.

At the same time, a guaranty is "an independent obligation separate from the underlying contract," and the fact that the guaranty is contained in the same instrument as the contract "does not affect their separate nature." *Armbrister v. Pushpin Holdings, LLC*, 896 F. Supp. 2d 746, 755 (N.D. Ill. 2012). The notice requirement is a provision of Wettersten's investment with Ditto. Timely notice is a condition precedent to Ditto's obligation to buy back the shares. Fox's obligation as a guarantor is triggered only when Ditto fails to perform following timely notice. Thus, the ambiguity of the term "within" relates not to the language of the guaranty but to the language of the underlying contract. As a result, the normal rule that ambiguity is construed against the drafter applies.

The Court further finds that the evidence shows that Ditto was the drafter of all relevant agreements. Wettersten testified she played no part in drafting any agreement into which she entered, including the November Investment. Fox confirmed Wettersten's testimony, stating that Ditto's investment agreements were drafted by Ditto's general counsel, which Fox then reviewed and approved. Given this finding, "within" must be understood to encompass both 90 days before and 90 days after the first anniversary. By contrast, the guaranty requires only that notice be

timely. So, if notice was given within 90 days of the first anniversary of the November Investment, then Fox would unambiguously be liable to perform if Ditto failed to do so.

Yet even if "within" is construed to mean only 90 days before the November Investment's first anniversary, and therefore Wettersten's notice was untimely, Fox still would be liable under the guaranty agreement. That is because, instead of treating the put option as expired on account of Wettersten's untimely notice, Fox entered into a new contract by agreeing to the extension as set out in the February Letter. Fox agreed that the put option remained valid but became exercisable on June 1, 2014, with notice required to be given between May 15, 2014 and May 31, 2014. Thus, Wettersten's first notice became irrelevant because there was a new operative notice period.

Having found that the February Letter modified the notice provision in the November Investment, the Court concludes that Wettersten did provide timely notice of her intent to exercise the put option by way of a written letter, dated May 15, 2014. Fox does not argue otherwise. And there was a breach of both the underlying contract and Fox's guaranty agreement caused by both Ditto and Fox's failure to buy back the shares for $150,000. That breach injured Wettersten by depriving her of money to which she was contractually entitled. Consequently, Wettersten has proved each element of her breach of contract claim.

## II.     Status of Fox's Personal Guaranty Following February Letter

Next, Fox asserts that his personal guaranty was extinguished by the February Letter. Specifically, because the February Letter modified the put option and made no mention of Fox's promise to pay in the event that Ditto failed to do so, Fox's guaranty was no longer a term of the put option. "In Illinois, the general principle applies that a guarantor is not released unless the essentials of the original contract have been changed and the performance required of the

principal is materially different from that first contemplated." *Chi. Exhibitors Corp. v. Jeepers! of Ill., Inc.*, 876 N.E.2d 129, 136 (Ill. App. Ct. 2007) (internal quotation marks omitted). The "key variable in determining whether there has been a material change in the guaranty agreement" is an increased exposure in the risk that the guarantor originally undertook. *Id.* (internal quotation marks omitted).

The Court finds that Fox's guaranty was not extinguished by the February Letter. Indeed, the only change made by the February Letter to the November Investment was the extension of the put option's exercise date and a new notice requirement. And the February Letter states explicitly that "[a]ll other terms of your investment with the Company remain intact and in full force and effect." (Pl.'s Ex. 2.) Just as before, Fox was required to pay Wettersten up to $150,000 to buy back her Ditto shares. Thus, the risk to which Fox was exposed had not changed at all. Moreover, there is no evidence suggesting that Fox gave any indication to Wettersten that his personal guaranty did not survive after the extension agreement. The Court therefore concludes that Fox remained liable to buy back the shares after the put option's exercise date was extended by the February Letter.

### III. Wettersten's Purchase of Series C Stock

While the November Investment unambiguously demonstrates that Wettersten suffered $150,000 in damages from Fox's failure to perform, Fox argues that Wettersten later entered into a new agreement sometime in October 2014 to use $100,000 of her put option to purchase Series C Stock. Accordingly, Fox's liability should be limited to $50,000. The issue is whether a new contract was formed under which Wettersten agreed to forgo a portion of her put option. In Illinois, for there to be a valid contract "there must be an offer and acceptance, consideration, and valid and certain contractual terms." *Lindy Lu LLC v. Ill. Cent. R.R. Co.*, 984 N.E.2d 1171, 1176

(Ill. App. Ct. 2013). A contract can only be formed where the acceptance conforms exactly to the offer. *Finnin v. Bob Lindsay, Inc.*, 852 N.E.2d 446, 448 (Ill. App. Ct. 2006).

Wettersten testified unequivocally that she never agreed to exchange $100,000 of her put option for Series C Stock. Nor did she recall any discussions about such an exchange during the relevant time period, other than a single email that she did not fully understand and to which she did not respond. Her testimony is corroborated by Charlie's testimony. Specifically, Charlie stated that while he discussed the possibility of converting Wettersten's put option into Series C Stock shares, he never heard back from Fox regarding the proposal. And because he never heard from Fox, he never actually approached his mother with the offer. While it is true that Wettersten received an email from Fox concerning Ditto's reverse stock split that referred to her 233,100 Series C Stock shares being split into 23,310 shares, the Court credits Wettersten's testimony that she was confused by the email and did not understand it. Moreover, the evidence shows that Wettersten was motivated to exercise her put option and get her money out of Ditto. On two occasions, she attempted to exercise her put option. Following her second attempt, Wettersten made several calls to Ditto and Fox inquiring as to the status of her payment but received no response. There is no evidence tending to show changed circumstances or any other explanation as to why Wettersten would back down from her desire to recoup a significant portion of her money invested in Ditto.

The Rights Certificate is the best evidence of Wettersten's agreement to purchase Series C Stock. However, for several reasons, the Court finds that the Rights Certificate does not constitute a valid and enforceable agreement. First, the document is not fully executed—it bears Wettersten's signature, but the signature line for Ditto is blank. Moreover, Wettersten unequivocally denied the signature's authenticity. And Charlie testified that he wrote his mother's

name on the signature line and filled in the blanks in the Rights Certificate himself.[4] In any case, the Court has compared the signature on the Rights Certificate with signatures that Wettersten confirmed as her own and finds that the signature on the Rights Certificate is not authentic. While the evidence does show that Wettersten had signed previous agreements with Ditto in block letters, the signature on the Rights Certificate is not purely a block signature. It is predominantly block letters, but also bears features of Wettersten's cursive signature, such as the flourish between the "C" and the "a" of her first name and the tail following the "n" in her last name. There is no evidence that Wettersten has ever signed documents using such a hybrid signature. In addition, Wettersten used her middle initial "F." in each authentic block signature submitted into evidence. No middle initial is used in the signature on the Rights Certificate. These differences, combined with Charlie's testimony, lead the Court to conclude that the signature on that document is not authentic.

Furthermore, the terms of the Rights Certificate are not consistent with the deal into which Wettersten ultimately entered. Most importantly, the Rights Certificate states that Wettersten is purchasing 233,334 shares of Series C Stock. But in the email sent to Wettersten concerning the reverse stock split, Wettersten is told that prior to the split, she held 233,100 shares of Series C Stock that would be converted to 23,310 shares post-split. (Def.'s Ex. 33.) Moreover, both Ditto's ledger and the shareholder list submitted to the SEC show Wettersten as holding 23,310 shares of Series C Stock. (Def.'s Exs. 42, 52.) The shareholder list reveals another inconsistency with the Rights Certificate: it lists Wettersten as having invested $58,275 to acquire the Series C Stock. By contrast, the Rights Certificate states that Wettersten is purchasing $58,333 worth of Series C

---

[4] The evidence shows that Charlie had a practice of filling out such documents for his family, as demonstrated by an email he sent to his grandfather in which he offers to fill out a rights certificate for Series C Stock for him. (Def.'s Ex. 31.)

Stock. The Court also notes that nowhere on the Rights Certificate is there any mention of Wettersten's put option or any agreement to forgo a portion of the option. Charlie testified that the Rights Certificate was merely a placeholder for a deal he was sketching out in his head. The inconsistencies on the Rights Certificate support Charlie's testimony, as it appears that the deal set forth on that document was not the deal recorded on Ditto's books. In short, it does not appear that Wettersten ever tendered a valid acceptance whatsoever. Even if her signature on the Rights Certificate was authentic, her acceptance did not correspond to the offer that Fox contends became a binding contract.

Without Wettersten's personal acceptance, the Court finds that Charlie could not enter into a contract on her behalf. In the first place, Charlie disavows that he entered into any such contract. Nor does the evidence show that Charlie had the apparent authority to enter into agreements with Ditto on his mother's behalf. "An apparent agent is one who, because of the manifestations of another, reasonably appears to third persons to be authorized to act as the other's agent." *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174, 183 (Ill. App. Ct. 2001). For Fox to establish that Charlie was Wettersten's apparent agent, he would need to prove that: (1) Wettersten consented to or knowingly acquiesced in Charlie's exercise of authority; (2) based on the actions of the principal, Wettersten, and her agent, Charlie, Ditto would reasonably conclude that Charlie was Wettersten's agent; and (3) Ditto justifiably and detrimentally relied on Charlie's apparent authority. *See id.*

Only Wettersten's words and conduct can establish Charlie's authority. *Id.* at 183–84. Here, Charlie did have agency to negotiate on his mother's behalf, but all the evidence shows that only Wettersten had the authority to actually enter into a contract. *Id.* ("[A]pparent authority arises when a ***principal***, through words or conduct, creates a reasonable impression that the agent

has the authority to perform a certain act.") Thus, Fox did not show that Wettersten consented to or knowingly acquiesced in Charlie's exercise of authority to approve a deal investing a portion of her put option into Series C Stock. Indeed, the course of conduct with respect to previous agreements such as the February Letter and the November Investment show that Wettersten always personally entered into agreements by signing a written contract. And both times she attempted to exercise her put option, Wettersten acted without Charlie's involvement. There is no evidence that would explain why she would then allow Charlie to act on her behalf in entering an agreement to forgo a portion of the option. Moreover, Fox even concedes that he had direct conversations with Wettersten regarding major investment decisions, including her exercise of the put option. He could not reasonably have believed that for a significant investment in Series C Stock, Wettersten would, for the first time, allow Charlie to proceed without her involvement. For these reasons, the Court concludes that Charlie could not have entered into any deal without his mother's express approval.

In short, there is no evidence showing that Wettersten entered into a valid and enforceable agreement to forgo a portion of her put option in exchange for shares of Series C Stock. Nor did Charlie have apparent authority to negotiate such a deal on her behalf. And because Wettersten timely provided notice of her exercise of the put option and Ditto failed to buy back the shares, Fox was obligated to buy back the shares for the full $150,000 pursuant to his personal guaranty. By failing to do so, he breached the guaranty agreement.

## CONCLUSION

The Court finds in favor of Wettersten and against Fox. The Clerk will enter Judgment in favor of Wettersten in the amount of $150,000 plus prejudgment interest. *See Cress v. Recreation Servs., Inc.*, 795 N.E.2d 817, 859 (Ill. App. Ct. 2003) (noting that the Illinois Interest Act, 815

ILCS 205/2, provides for prejudgment interest awards where there is a "fixed and easily calculated amount due from a debtor-creditor relationship that has come into existence by virtue of a written instrument"); *Claude S. Corp. v. Henry's Drive-In, Inc.*, 201 N.E.2d 127, 135 (finding that a guaranty falls within the terms of the Illinois Interest Act, 815 ILCS 205/2).

ENTERED:

Dated:  September 30, 2019

Andrea R. Wood
United States District Judge